UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA          CASE NO. 22-cr-00075

VERSUS                            JUDGE DONALD E. WALTER

ODIS L TAYLOR (01)                MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Odis Taylor ("Defendant") is charged with three counts of felon in possession of a firearm. The charges arose out of an investigation into a shooting in the Lakeside-Allendale area of Shreveport. As a result of the investigation, Defendant was detained and ultimately arrested. After Defendant was arrested, a state search warrant was issued for his vehicle. Inside the vehicle were a stolen .40 caliber pistol, a box of ammunition, and an extra magazine.

Before the court is Defendant's Motion to Suppress (Doc. 22). Defendant argues there was insufficient probable cause to support his arrest and that his statements were not voluntary. Defendant seeks to suppress all statements and evidence seized as a result of his arrest. For the reasons that follow, it is recommended that the motion be denied.

**Relevant Facts**

A hearing was held on the motion to suppress. The following facts were established. On January 26, 2021, at approximately 1:36 p.m., Officer Eric Coker with the Shreveport Police Department responded to a call regarding a shooting. Coker arrived at Willis-

Knighton North Hospital and contacted the victim, Trometric Humphrey. Humphrey told Coker that he was driving to pick up his uncle, who lives at the corner of Mabel Street and Darien Street in the Lakeside neighborhood. Humphrey saw a gray hatchback vehicle with a hard Louisiana license plate stopped in the middle of Mabel Street, blocking his lane of travel. Two black males were standing outside of the vehicle talking to the driver. Tr. 6.

Humphrey waited to see if the vehicle would move, then attempted to drive around it. Tr. 6-7. Humphrey described the driver of the vehicle as a black male in his early to mid-20s, over six feet tall with a slim build, light-skinned with a scruffy beard, and wearing a red long-sleeved shirt and red skull cap. Tr. 7, 13. The driver brandished a black handgun and shot in Humphrey's direction. Humphrey said he heard around eight shots, and he was struck by two of them. He saw the driver exit the vehicle. Humphrey kept driving to try to get distance from the hatchback. Humphrey then drove himself to the hospital. Tr. 7. After getting this statement from Humphrey, Officer Coker inspected Humphrey's vehicle and found at least ten bullet entrances as well as bullet fragments inside the vehicle. Tr. 9.

Detective Jason Saiz with the violent crimes office was assigned as the lead investigator in the case. Saiz went to the hospital, where Officer Coker briefed him on the situation. Tr. 27. Saiz interviewed Humphrey and inspected Humphrey's car. Tr. 29. He saw two fully intact projectiles on the driver's seat and bullet fragments in the back seat. Tr. 30.

Saiz went to the crime scene, which was on the 2100 block of Mabel Street. He collected fourteen .40-caliber shell casings from the scene. Tr. 32. Saiz interviewed Humphrey's uncle, Roderick Allen, who lived down the street from where the shooting

took place. Tr. 32. Allen said that he was sitting outside waiting for Humphrey to pick him up when he heard several gunshots. He saw Humphrey's car make a right onto Darien Street. A gray car that looked like a Kia hatchback was following Humphrey. Tr. 33.

Later that day, Saiz went back to his office. He learned that Humphrey had called 911 to report that, while he was on his way home from the hospital, he saw the shooter's car at a convenience store on Madison Avenue. Tr. 35. Humphrey went inside the store. The shooter walked past Humphrey as Humphrey walked in the door. Tr. 36.

The next day, Saiz was contacted by Officer Arthur Green. Officer Green was very familiar with the area where the shooting took place, and he visited the Madison Avenue convenience store on a daily basis. Tr. 18. Green recognized the description of the vehicle used in the shooting because it was frequently at the convenience store. Tr. 19. The person who drove the vehicle fit the description of a light-skinned black male who was about six feet tall. Tr. 21. Green told Saiz that if he saw the car while on patrol, he would get the license plate number. Green saw the car at the store a few minutes later, and he texted the plate number to Saiz. Tr. 38.

Saiz ran the plate number, and it came back as belonging to a two-door Hyundai hatchback. Tr. 38. The vehicle was registered to Keyond Lewis. Lewis did not fit the description of the shooter and had a Bossier City address, so Saiz did not think Lewis was the shooter. Tr. 38.

Saiz did some research on the Madison Avenue convenience store and learned that on December 25, 2020, an aggravated assault occurred at the store. A man came into the store to buy something. The man went to pay for his items, but he did not think the clerk

was moving fast enough. The man placed a black handgun on the counter and told the clerk to give him his stuff or he was going to start shooting. Tr. 39. The clerk said the man was in the store often, and she had overheard customers call the man either "Sergio" or "Poo Bear." Tr. 40.

Saiz researched the names "Sergio" and "Poo Bear." He found a result for a man named Sergio Taylor, who lived two blocks from the store. Further investigation revealed that Sergio had two brothers, David Taylor and Odis Taylor (Defendant). Saiz searched these names in his system and found photographs of the three brothers from a 2006 police report. Defendant came closest to matching Humphrey's description of the shooter. Tr. 41.

Saiz and Detective Adam McEntee went to the Madison Avenue convenience store. A clerk at the store told Saiz that Sergio was the man who brandished the gun in the December 25 incident. She said that "Poo" drove the gray hatchback. Tr. 42-43. Detective McEntee later showed the clerk the 2006 photograph of Defendant, and she identified him as "Poo." Tr. 46.

Saiz then requested a six-person photo array from the Louisiana Fusion Center. Tr. 47. On February 4, 2021, he and McEntee took the array to Humphrey's house. Humphrey told the detectives that he had a friend in the neighborhood who told him that the shooter's name was "Poo Bear" and that he lived nearby and drove a Hyundai. Tr. 48. Humphrey recounted the story of the shooting, and his description was consistent with the description he gave the night of the shooting. Tr. 49.

Saiz returned to his patrol car so that McEntee could present the six-person photo array to Humphrey. The discussion of the array was recorded. Gov. Exhibits 13 and 14. Humphrey quickly stated that none of the photos were the shooter. Saiz returned to where McEntee and Humphrey were standing, and the recording was stopped. Gov. Ex. 13. Saiz told Humphrey that if he could not make an identification in the photo array, they would have to find a different way to identify the shooter. Tr. 51. Saiz was concerned that Humphrey recognized one of the individuals in the photos and would seek out the shooter himself. Saiz warned Humphrey not to retaliate against the shooter. Humphrey then asked to look at the photo array again. Tr. 51.

Saiz went back to his patrol car, and McEntee began recording as Humphrey looked at the array Humphrey said that photo three (which was Defendant) "look[ed] like the closest to him," but he looked too old due to having gray hair. But Humphrey acknowledged that the shooter was wearing a hat. Humphrey said that photo four "could be" the shooter. He was sure that none of the other photos were the shooter. Humphrey said, "I'll know him when I see him, like, in person." Gov. Ex. 14.

McEntee and Saiz returned to the violent crimes office. Saiz began to prepare an affidavit for an arrest warrant for Defendant. Tr. 57. McEntee received a call from the convenience store clerk, who told him that Poo had just left the store. McEntee went to the vicinity of the store and saw a gray Hyundai hatchback being driven by Defendant. The license plate on the hatchback matched the license plate number that Officer Green gave to Detective Saiz. Tr. 63. McEntee followed the vehicle and radioed for assistance. Tr. 87. The vehicle pulled into the driveway of a house. McEntee exited his vehicle and

approached Defendant as Officer Connor Ballard pulled into the driveway in his patrol car. Defendant exited the driver's seat and McEntee told him that he was being detained because detectives needed to speak with him about a shooting. Tr. 89.

Defendant was handcuffed and placed in the back of Ballard's car. Tr. 89, 99. Ballard drove Defendant to police headquarters. Tr. 104. Meanwhile, McEntee called a tow truck for Defendant's vehicle to be impounded. McEntee performed an inventory of the car by looking through the windows. He saw a handgun under the front driver's seat. Tr. 91-92.

Detective Saiz interviewed Defendant at police headquarters. He read Defendant his Miranda rights and presented Defendant with a notice of rights form, but Defendant refused to sign it. Tr. 59-60. Defendant was placed under arrest and transported to the city jail. Tr. 60.

**Law and Analysis**

    **A. Probable Cause to Arrest**

Defendant argues that his arrest violated the Fourth Amendment because it was based on a tentative photo identification. Under the Fourth Amendment, police officers may briefly detain individuals on the street, even though there is no probable cause to arrest them, if they have reasonable suspicion that criminal activity is afoot. United States v. Mitchelletti, 13 Fd.3d 838, 840 (5th Cir. 1994). Reasonable suspicion exists if there are specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant a detention. Terry v. Ohio, 392 U.S. 1, 21 (1968). Whether reasonable suspicion exists is an objective inquiry that turns on whether the circumstances,

viewed objectively, justify the challenged action. Scott v. United States, 436 U.S. 128, 138 (1978).

The officers had reasonable suspicion to detain Defendant to investigate the shooting. The victim provided a physical description of the shooter that was consistent with Defendant's appearance and described the vehicle used in the shooting as a "gray hatchback," which is the type of vehicle Defendant was driving. Officer Green, who was familiar with the area, recognized the description of the vehicle. When he saw the vehicle at the Madison Avenue convenience store, he got the license plate number for Detective Saiz. The license plate number matched the car Defendant was driving when he was detained. Tr. 63.

Detective Saiz investigated similar crimes in the area, and he learned that a person with the alias "Sergio" or "Poo Bear" had brandished a handgun at the Madison Avenue convenience store. A store clerk familiar with the area told Saiz that Sergio was the man who pulled the gun, and "Poo Bear" was a man who frequented the store and drove a gray hatchback. The clerk identified a photo of Defendant as "Poo Bear." Tr. 42-43. Humphrey also told Detective Saiz that a friend who lived in the neighborhood told him that "Poo Bear" is the person who shot him. Tr. 48. Based on the totality of these circumstances, officers had ample reasonable suspicion to detain Defendant in connection with the shooting.

After detaining and handcuffing Defendant, Officer McEntee peered into the windows of Defendant's vehicle as part of the impoundment process. He saw a handgun in plain sight by the driver's seat. The officers knew that Defendant was a felon and could

not legally possess a firearm. Defendant was then transported to police headquarters, where he was placed under arrest. There was probable cause to arrest Defendant for prohibited possession of a firearm based on the gun in that was in plain view in the vehicle Defendant was driving.

### B. Voluntariness of Statements

Defendant argued in his motion to suppress that the Government could not show that his statements were voluntary. The Government stated in its pre-hearing brief that it would not introduce in its case-in-chief any statements made by Defendant prior to being read his Miranda rights. In its post-hearing brief, the Government further stipulated that it would not use in its case-in-chief the recording of Defendant's Miranda warnings or any associated statements. Based on those stipulations, this issue is moot.

Accordingly,

It is recommended that Defendant's Motion to Suppress (Doc. 22) be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 16th day of November, 2022.

_____
Mark L. Hornsby
U.S. Magistrate Judge